### COLUMBIA CHEMICAL CO. v. DUFF.

(Circuit Court of Appeals, Third Circuit. February 19, 1909.)

#### No. 50.

PATENTS (§ 218*)—LICENSES—ROYALTIES—RIGHTS AND LIABILITIES OF PARTIES.
  Plaintiff contracted to furnish defendant with plans and specifications for building four patented gas producers, with a warranty that in addi-

·*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion to the gas they should produce as a by-product 70 pounds of sulphate of ammonia per ton of coal consumed, provided such coal contained not less than 1.3 per cent. of nitrogen. Defendant agreed to build the machines and to pay a license fee for their use if they fulfilled the warranty. Having refused to make such payment, plaintiff sued therefor, alleging fulfillment of the warranty, which defendant denied, and that issue was the only one tried. *Held*, that it was error for the court to instruct the jury that if defendant used coal containing less than the required per cent. of nitrogen it waived the warranty of 70 pounds of sulphate of ammonia per ton, and plaintiff could recover if a proportionate amount was produced, since the requirement as to the percentage of nitrogen was one for plaintiff's benefit, which he alone could waive or could insist on, and that if he consented to the use of inferior coal, as he admittedly did, the waiver was his and not defendant's, and did not relieve him from the warranty.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 330; Dec. Dig. § 218.*]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

George B. Gordon, William Watson Smith, Ralph Longenecker, and Allen T. C. Gordon, for plaintiff in error.

Alexander Gilfillan, Edwin W. Smith, and Reed, Smith, Shaw & Beal, for defendant in error.

Before GRAY and BUFFINGTON, Circuit Judges, and ARCHBALD, District Judge.

BUFFINGTON, Circuit Judge. In the court below, Edward J. Duff, hereafter styled "plaintiff," brought an action of assumpsit against the Columbia Chemical Company, hereafter styled "defendant," to recover $15,500, license fees alleged to be due him under a contract between them dated November 28, 1903. On the trial, plaintiff recovered that sum with interest, and, judgment having been entered in his favor on the verdict, defendant sued out a writ of error.

In considering the case, we must bear in mind that this action is not brought to recover the purchase price of machinery which a plaintiff has built and which a defendant retains and refuses to pay for, but is brought to recover license fees for use of a patented device which this defendant built at its own cost and on which it agreed to pay license fees in case it fulfilled certain guaranteed requirements. The plaintiff resided in England, and was anxious to demonstrate in America the capacity of a gas-producer device patented by him. The defendant, a chemical company, was a large user of gas, and was desirous of installing a plant which could produce, from bituminous coal, gas and certain quantities of sulphate of ammonia as a by-product. To secure these objects the contract was entered into, which, so far as here applicable, stipulated that plaintiff—

"supply, free of charge, all plans and details necessary for the erection of the plant for the utilization of the said patents and any improvements thereof, and will give full explanation thereof."

On its part the defendant stipulated:

"Fifth. That during the residues of the terms of the said letters patent mentioned, and any extension thereof respectively the licensees will pay to the grantor the following royalties, viz.: A sum of four thousand two hun-

dred and fifty dollars ($4,250) for each and every gas producer, the subject of the before-mentioned letters patent, which they shall erect at their works as aforesaid.

"Sixth. That the licensees shall and will commence the erection, within six calendar months from the date of these presents, of at least four producers, amounting at the rate of royalty above mentioned to the sum of seventeen thousand dollars ($17,000.00), which amount shall be payable by said licensees to said grantor as follows, to wit: the sum of one thousand five hundred dollars ($1,500.00) when said grantor shall deliver to said licensees complete working plans and details in such form and manner as to enable said licensees to begin the construction or erection of said producers. The remainder of said amount, to wit, the sum of fifteen thousand five hundred dollars ($15,500.00), shall be paid to said grantor by said licensees in full as soon as the said four producers shall be completed and shall operate in the manner and with the results hereby guaranteed by said grantor, as follows, to wit: from each ton of 2,240 pounds of coal treated in said producers, or any of them, there shall be in addition to the gas a yield of seventy (70) pounds of sulphate of ammonia provided that the coal contains not less than one and three-tenths per cent. (1.3%) of nitrogen; and the gas produced shall be free from soot, tar or other residuum, which if present, could or would clog the flues and require them to be burned."

The defendant thereafter erected the four producers at an expense of some $85,000. It paid the plaintiff the $1,500 stipulated. Finding, as it alleged, that the producers would not fulfill the guaranty requirements, defendant ceased in 1906 to use them and plaintiff's process, and declined to pay the remaining $15,500 license fees. In 1907 the plaintiff, alleging performance of the contract on his part, brought suit to recover said sum. His cause of action was thus stated:

"That the said chemical company did begin the construction of the four producers at Barberton, Ohio, and on or about the 26th day of September, 1905, the said producers were operated, and the result was produced as called for by the contract, and from each ton of 2,240 pounds of coal treated in said producers, or any of them, there was a yield of 70 pounds of sulphate of ammonia, and the gas produced was free from soot or other residuum or deposit which would clog the flues or require them to be burned; that the Columbia Chemical Company had, upon the delivery to it of the working plans and details, paid to the plaintiff in this case $1,500, and, upon the completion of the producers and the operation in a manner as aforesaid under the contract, the amount hereinbefore stated, $15,500, with interest thereon, from 9th day of February, 1906, thereupon became due; and for this amount this suit is brought as aforesaid. And the said plaintiff avers that he did everything to be done by him provided in said contract, and that he kept and performed all the covenants and conditions to be kept and performed by him as grantor in a contract hereinbefore mentioned."

To this the defendant replied, denying the producers met the guaranteed requirements; alleged it had spent $85,046.16 in building them, and $8,432 in remodeling them; that it expended $12,990.32 in operating them before it became evident they were a failure; and had paid $1,500 on account as above noted. The $107,968.48, the aggregate of said sums, it claimed to recover from the plaintiff, and to have a balance for said sum certified in its favor. On this state of pleadings, viz., fulfillment of the guaranty, the case was tried by counsel, argued to the jury, and to it the points of both sides were directed. The contention of the defendant's counsel was that there must be a complete compliance with the terms of the guaranty, viz., that a ton of 2,240 pounds of coal should produce 70 pounds of ammonia. The contention of the plaintiff's counsel was that there could be a proportionate or partial performance of the guaranty, viz., that if the coal used

contained less than 1.3 per cent. of nitrogen, there was a correspondingly proportionate reduction in the 70-pound requirement of sulphate of ammonia. Both sides, it will be observed, conceded there must be a fulfillment of the guaranty, but they differed as to the mode of fulfillment. Neither side in its pleadings, points, or evidence alleged the guaranty had been waived or its terms varied. When the court charged the jury, it submitted the case on the theory of a waiver of the guaranty, saying:

"On the other hand, if you believe from all the evidence that the defendant waived the general requirement of said guaranty and undertook to furnish coal for practical test containing less than 1.3 per cent. of nitrogen, and that said test showed a proportionate yield of 70 pounds or more of nitrogen to such quantity of coal, that is, that in proportion to the actual amount of nitrogen contained in the 2,240 pounds the yield was at the rate of 70 pounds or more if the coal had contained the required per cent. of nitrogen, then you must find for the plaintiff."

The practical effect of this was to deny both the plaintiff's and defendant's contention that the issue was the fulfillment of the guaranty, and to substitute for that issue one of waiver. It is clear, however, the alleged waiver was based on an erroneous assumption by the court that the contract meant that 1.3 per cent. nitrogen in the coal was a requirement the defendant could insist upon, and which, therefore, it waived by using a coal of less nitrogen. Had this assumption been correct, there might have been some ground for holding that there should be, as contended by the plaintiff, a proportionate reduction in the guaranteed 70 pounds of sulphate of ammonia from each ton. But the presence of 1.3 per cent. of nitrogen in the coal was a requirement that plaintiff, not the chemical company, had a right to insist on, and which, therefore, was not a subject of waiver by the company. The aim of the process was to get a yield of 70 pounds of sulphate of ammonia. Now nitrogen is the basis of ammonia, the union of sulphuric acid and nitrogen producing sulphate of ammonia. Duff, therefore, had a right to demand a coal containing the stated percentage of nitrogen. But the testimony was that the machine had not worked with coal containing so much nitrogen, and Duff therefore attempted, with a coal of less nitrogen, to produce the guaranteed 70 pounds of sulphate of ammonia. It was his waiver, not the company's. This is perfectly clear not only from the contract itself, but Duff in his testimony makes it clear that the nitrogen in the coal was his and not the company's right. Thus Duff in his sworn statement of claim and his averment, quoted above, of fulfillment of the guaranteed result of 70 pounds of sulphate of ammonia, makes no reference whatever to nitrogen, and in answer to the question in reference to the trial of the machine, "Well, you didn't have any analysis during the test that came up to 1.3, did you?" he replied, "No; they were not obliged to come up to 1.3." And in answer to the question, "So then, during your stay there, you did not know the coal they were using didn't have 1.3 of nitrogen in it?" he said, "Yes, we found that out on the test." And also, when he was asked, "And did you ask them why they didn't use coal that had 1.3 in it?" he replied, "No, I did not."

It follows, therefore, that in bringing the question of waiver into the case as an act of the chemical company, and in embodying in the

defendant's points the factor of a waiver by defendant, the court fell into an error which did the defendant injustice. Under the contract, the plaintiff was bound to produce 70 pounds of sulphate of ammonia per 2,240 pounds of coal, and to do this he had a right to call upon the plaintiff to use coal containing 1.3 per cent. of nitrogen. If he chose to use coal with a less per cent. of nitrogen, that was his right, but he did not thereby lessen his guaranteed output of 70 pounds of sulphate of ammonia. He chose to make the test with coal of less nitrogen; and the issue was whether he did or did not produce 70 pounds of sulphate of ammonia. He alleged he had; the defendant alleged he had not. That was the issue involved, and, in substituting for that issue an issue of a waiver by the defendant, the court below fell into reversible error.

Lest nonreference to the court's submission to the jury, as an agreed-upon test, of the September efforts to run the plant, might be misleading, we deem it proper to state we find no evidence that the parties agreed that these operations should be a test of the guaranty.